# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2766

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Derek Joseph Carlson, | * | |
| also known as Cup, | * | |
| also known as Buttercup, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 14, 2010
Filed: July 27, 2010

_____

Before BYE, MELLOY, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Derek Carlson appeals the district court's[1] denial of his motion to suppress his pre-<u>Miranda</u>[2] statements, denial of his motion for a new trial, denial of his trial counsel's motion to withdraw, and admission of his prior drug conviction at trial. For the reasons set forth below, we affirm.

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[2]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

# I.

On January 22, 2007, law enforcement officials searched the home of Eric Rekonen pursuant to a drug conspiracy investigation. During the search, officials recovered Carlson's name and address in addition to over $80,000, methamphetamine, various drug paraphernalia, and a shaving cream can with a false bottom.

St. Louis County Sheriff's Deputy Elizabeth Flanagan and two Drug Enforcement Agency (DEA) agents attempted to contact Carlson. The DEA agents left a message with Carlson's roommate stating that they wanted to speak with Carlson and to serve him with a subpoena, and that they would serve the subpoena at his place of employment if he did not contact them. Carlson then arranged to meet with the DEA agents and Deputy Flanagan over his lunch break. The three law enforcement officers arrived at the restaurant before Carlson and deliberately arranged themselves so that Carlson would sit on the outside of their booth. When Carlson arrived, he requested permission to record the meeting, per the recommendation of his attorney. The officers stated that the meeting would end immediately if Carlson insisted on recording it and informed him that he was: not under arrest, free to leave at any time, and free to have an attorney present. Carlson agreed to continue the meeting without recording it and admitted, during questioning, that he was acquainted with a number of the co-conspirators; that he had purchased drugs from them in the past; and that Rekonen had asked him to collect drug debts, but he had declined to do so. Carlson eventually requested an attorney, and the officers ended the conversation immediately upon his request. The officers then served the subpoena and parted ways with Carlson.

Two months later, Carlson was arrested pursuant to a one-count indictment charging him with conspiring to distribute and possessing with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. Carlson filed a motion to suppress the statements he had made during the restaurant meeting. Following an evidentiary hearing, the magistrate

judge[3] issued a report and recommendation ("R & R"), recommending the denial of Carlson's motion to suppress because Carlson had not been in custody and his statements were voluntary. The district court adopted the R & R and denied the motion to suppress.

Prior to trial, the government moved under Federal Rule of Evidence 404(b) to admit Carlson's 2001 Minnesota state conviction for possessing methamphetamine. Notably, Carlson had been arrested in possession of a false-bottomed Tinactin spray can containing over six grams of methamphetamine. The district court did not address the motion until Carlson's jury trial. Outside the hearing of the jury, the court stated that Carlson's prior conviction was admissible: as evidence of a lack of mistake, probative as to his intent, and involved a similar modus operandi because Carlson had admitted to possessing a false-bottom can in his prior conviction and a false-bottom shaving cream can had been seized in the present case. The court did not make an explicit ruling on the admissibility of the underlying facts of the prior conviction.

The government called Duluth Police Department Officer Jeff Kazul to testify as to Carlson's 2001 state drug conviction. Before Officer Kazul testified, the court gave the jury a limiting instruction, stating "[C]onsider [Kazul's testimony] on the matters of intent, knowledge, absence of mistake, or accident. . . . You may not convict a person simply because you believe that he may have committed a similar act on a prior occasion." (Trial Tr. vol. 2, 243-44, Feb. 6, 2008.) Officer Kazul testified that he had been one of the arresting officers in Carlson's 2001 arrest, that Carlson had admitted that the false-bottomed Tinactin spray can was his, and that over six grams of methamphetamine were found in the false bottom. The court allowed Carlson to make a record of his objection to Officer Kazul's testimony. Carlson argued that it was improper to allow the jury to hear the underlying facts of his prior state

---

[3]The Honorable Raymond L. Erickson, United States Magistrate Judge for the District of Minnesota.

conviction. The court gave a second limiting instruction during the final jury instructions.

The government also introduced recorded phone conversations between Rekonen and Carlson, during which they discussed individuals who owed Rekonen money and from whom Carlson needed to collect. Other witnesses at Carlson's trial included two of Carlson's co-conspirators, Clayton Celley and Travis Hanson, who testified that Carlson was part of Rekonen's drug conspiracy. Testimony also revealed that Celley had given Rekonen the false-bottomed shaving cream can that officials had seized in the search of Rekonen's home.

After the jury returned a guilty verdict but before Carlson was sentenced, Carlson's trial counsel moved for a new trial based on newly discovered evidence. At a July 8, 2009 hearing, Carlson argued that a new trial was warranted because Celley and Hanson had schemed to lie in another case in order to receive sentence reductions in the present case. Counsel confirmed, however, that no witness would testify as to a plot to manufacture testimony at Carlson's trial. Carlson's trial counsel also requested permission to withdraw due to a conflict of interest, because a former client, who was a witness in support of Carlson's motion for a new trial, had withdrawn his waiver of privilege. The district court found that the witness's testimony would not be relevant, and denied both motions. The court later sentenced Carlson to 130 months in prison.

II.

First, Carlson claims that the district court erred in refusing to suppress his statements from the restaurant meeting. Although he acknowledges that he was not actually in custody at the meeting, he argues that his statements to the officers were involuntary because he feared that he would be served the subpoena at work, the subpoena meant that he would have to testify against his violent co-conspirators, and

the DEA agents used strong-arm tactics in a "custody like situation." (Appellant's Br. 18.)

We review the findings of fact supporting a district court's denial of a motion to suppress for clear error, and review legal conclusions based on those facts de novo. See United States v. Ingram, 594 F.3d 972, 976 (8th Cir. 2010), pet. for cert. filed (U.S. June 15, 2010) (No. 09-11569). In United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990), we identified six factors to consider in determining whether an individual is in custody for purposes of Miranda:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police-dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. at 1349. However, these factors are not "exclusive," and "[t]he ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." United States v. Czichray, 378 F.3d 822, 827-28 (8th Cir. 2004).

Here, Carlson was informed at the beginning of the meeting that he was not under arrest and that he was free to leave at any time. See United States v. New, 491 F.3d 369, 373-74 (8th Cir. 2007) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody is for police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." (quotation and alterations omitted)); United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) ("[A]n explicit assertion that the person may end the

encounter . . . generally removes any custodial trappings from the questioning."). In addition, Carlson was not restrained in a fashion similar to formal arrest because he sat on the outside of a booth in a public restaurant. See United States v. Martin, 369 F.3d 1046, 1057 (8th Cir. 2004) (finding that interview was not custodial when it took place at public restaurant, and defendant's freedom was unrestrained beyond ordinary confines of being seated at table in public cafeteria). Furthermore, the officers did not arrest Carlson at the end of the meeting. See Griffin, 922 F.2d at 1349.

Contrary to Carlson's arguments, "the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." United States v. Lebrun, 363 F.3d 715, 721 (8th Cir. 2004) (en banc) (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). Carlson's reluctance to be served with a subpoena was not so coercive as to render the interview custodial, and, as such, the meeting with the law enforcement officials was non-custodial and voluntary. Cf. Martin, 369 F.3d at 1057 (at interview, agents' discussion of FBI surveillance techniques and implication that FBI possessed information on defendant was not type of coercion that rendered interview custodial). We therefore find no basis for reversing the district court's denial of Carlson's motion to suppress.

### III.

Carlson next argues that the district court erred in denying his post-trial motion for a new trial. We review for an abuse of discretion a district court's denial of a motion for a new trial. United States v. McClellon, 578 F.3d 846, 857 (8th Cir. 2009), cert. denied, 130 S. Ct. 1106 (2010).

> To receive a new trial based on newly discovered evidence, a defendant must show (1) that the evidence was not discovered until after the trial; (2) that due diligence would not have revealed the evidence; (3) that the

evidence is not merely cumulative or impeaching; (4) that the evidence is material; and (5) that the evidence is such as to be likely to lead to acquittal.

United States v. Coplen, 565 F.3d 1094, 1096 (8th Cir.), cert. denied, 130 S. Ct. 565 (2009) (quotation omitted). This is a "rigorous" standard, "because these motions are disfavored." United States v. Baker, 479 F.3d 574, 577 (8th Cir. 2007) (quotation omitted). We review Carlson's argument of newly discovered evidence in light of these requirements.

Carlson submitted sealed exhibits, including a letter containing secondhand hearsay, stating that Celley had lied while testifying in another case. Carlson argues that (1) Celley's testimony was tainted, (2) Carlson should have been allowed an evidentiary hearing on the evidence, and (3) a new trial was warranted. Carlson relies heavily on Mesarosh v. United States, 352 U.S. 1 (1956), where a witness had potentially committed perjury as to a collateral matter. The court stated, "[t]he dignity of the United States Government will not permit the conviction of any person on tainted testimony," id. at 9, and held that the testimony in Mesarosh was so tainted that it provided sufficient grounds to grant a new trial, see id. at 10.

We find Carlson's reliance on Mesarosh misplaced. There, the government itself brought a motion to remand the case, because its witness—an informant paid to infiltrate the Communist party—had been "wholly discredited." Id. at 9. The Court specifically noted that "[s]uch an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is merely cumulative or impeaching is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." Id. (quotation omitted).

Here, the only evidence in support of Carlson's motion for a new trial was impeachment evidence on a collateral matter, which is insufficient to warrant a new

trial. See Coplen, 565 F.3d at 1096 ("[A] new trial is not warranted when, as here, the additional evidence would be merely impeaching."). As a result, we find no exceptional circumstances warranting an evidentiary hearing. See Baker, 479 F.3d at 579 (absent exceptional circumstances, motion for new trial based on newly discovered evidence may be decided on affidavits without hearing). Accordingly, we find no abuse of discretion in the district court's denial of Carlson's motion for a new trial.

IV.

Carlson next argues that the district court's refusal to allow his trial counsel to withdraw violated his right to effective assistance of counsel. "We review for abuse of discretion a district court's decision to allow counsel to withdraw." Allen v. United States, 590 F.3d 541, 544 (8th Cir. 2009).

At the post-trial hearing, counsel stated that the conflict of interest limited his ability to offer evidence on the new-trial motion. Carlson argues that the court's refusal to hear witness testimony on the new-trial motion was a deliberate decision to avoid counsel's conflict, and Carlson emphasizes that counsel had consulted with the Minnesota Lawyers Board of Professional Responsibility as well as the Federal Public Defender, and was advised by all that counsel had a conflict. However, counsel confirmed at the hearing that none of the available witnesses would have testified as to a plot regarding manufactured testimony at Carlson's trial. The court conducted a hearing and determined that the perceived conflict had no bearing on Carlson's case. Because the proposed testimony was not relevant to Carlson's case, we find no abuse of discretion in the district court's refusal to allow Carlson's trial counsel to withdraw. See Fleming v. Harris, 39 F.3d 905, 908 (8th Cir. 1994) ("The decision to allow counsel to withdraw is left to the discretion of the district court.").

To the extent that Carlson is raising ineffective assistance of counsel, such a claim should be pursued in a 28 U.S.C. § 2255 proceeding. See United States v.

McAdory, 501 F.3d 868, 872 (8th Cir. 2007) ("We ordinarily defer ineffective assistance of counsel claims to 28 U.S.C. § 2255 proceedings."); see also Caban v. United States, 281 F.3d 778, 779, 781 (8th Cir. 2002) (in section 2255 proceeding, where defendant asserts ineffective assistance of counsel because of conflict of interest involving his attorney, trial court has duty to conduct searching inquiry into possibility of constitutional violation arising from that conflict; failure to undertake this inquiry mandates automatic reversal of any conviction upon showing of possible prejudice).

V.

Last, Carlson claims that the district court improperly admitted evidence of his 2001 state drug conviction, as well as the underlying facts of his 2001 state drug conviction. Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). Prior bad act evidence may be admissible for another purpose, but its admission is subject to a four-factor admissibility test:

> The evidence must: (1) be relevant to a material issue raised at trial, (2) be similar in kind and close in time to the crime charged, (3) be supported by sufficient evidence to support a finding by a jury that the defendant committed the other act, and (4) not have a prejudicial value that substantially outweighs its probative value.

United States v. Turner, 583 F.3d 1062, 1065-66 (8th Cir. 2009) (quotation omitted), cert. denied, 130 S. Ct. 1928 (2010). We generally review a district court's Rule 404(b) ruling for an abuse of discretion. See id. at 1065. Subject to the district court's broad discretion to admit evidence of other crimes, we will reverse a district court's decision to admit evidence under Rule 404(b) "only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." United States v. Littlewind, 595 F.3d 876, 881 (8th Cir. 2010). However, in the absence of an objection at trial, we review for plain error the

admission of evidence under Rule 404(b). See United States v. Washington, 596 F.3d 926, 945 (8th Cir. 2010).

The government argues that Carlson forfeited his objection to evidence of his prior conviction because he did not object to the admission of the evidence until after Kazul testified, and that plain-error review should be conducted. See United States v. Weaver, 554 F.3d 718, 722 (8th Cir.) ("Plain-error review permits reversal only if the error was so prejudicial as to have affected substantial rights resulting in a miscarriage of justice."), cert denied, 130 S. Ct. 140 (2009). However, we need not decide which standard of review to apply here, because even under the more stringent standard of review, the district court properly admitted evidence of Carlson's prior conviction.

Carlson argues that his conviction for possessing methamphetamine had no connection to the present case, was too remote in time to be probative of lack of mistake or intent, and was introduced to suggest that he was the type of person who would sell drugs. We conclude that Carlson's prior state conviction was relevant to whether he was part of the present drug conspiracy. See Turner, 583 F.3d at 1066 (evidence of prior drug dealings is relevant to material issue of whether defendant had requisite intent to enter into conspiracy). We also hold that the prior conviction was sufficiently similar in kind and close in time to the present case. See United States v. Trogdon, 575 F.3d 762, 766 (8th Cir. 2009) (holding that evidence of 11-year-old conduct was not too far remote in time), cert. denied, 130 S. Ct. 1116 (2010). Furthermore, the probative value of the prior conviction outweighed the danger of unfair prejudice. See United States v. Mendoza, 341 F.3d 687, 692 (8th Cir. 2003) ("Evidence of prior conviction for possession of methamphetamine is probative of a defendant's knowledge and intent concerning current charges of conspiracy to distribute that same drug, especially where the defendant claims he lacked knowledge or intent to distribute the drug."). Therefore, the district court properly admitted the 2001 state conviction into evidence under Rule 404(b).

-10-

Carlson further argues that the district court abused its discretion in allowing the jury to hear the evidence concerning the Tinactin spray can, particularly because the false-bottom shaving cream can in the present case was never connected to him. He argues that: (1) the Tinactin spray can from his 2001 state conviction was introduced to prove that he "had the character of an illegal seller of drugs" because he had possessed drugs in the past (Appellant's Br. 11); (2) the government's introduction of the Tinactin spray can was unfairly prejudicial because it was used to imply a characteristic unique to this drug conspiracy, when these types of cans are available commercially, including on Amazon.com; and (3) the court's two limiting instructions—at the time of Kazul's testimony and again during the final jury instructions—were insufficient to "cure the unfair prejudicial effect on the jury when they were introduced to false bottom cans with the implication that the use of which is unique to this group of drug dealers" (Appellant's Reply Br. 14). In support of these arguments, Carlson cites United States v. Heidebur, 122 F.3d 577 (8th Cir. 1997), in which we vacated the defendant's conviction where the evidence that the defendant had sexually exploited his stepdaughter had been submitted to demonstrate that the defendant had knowingly possessed explicit photos of her, because the evidence was probative only of propensity. Id. at 578-581.

Although the admission of the underlying facts of Carlson's prior conviction is of some concern because the shaving cream can in the present case had no apparent connection to Carlson, we find that the court's two limiting instructions were sufficient to cure any unfair prejudice. See United States v. Lothridge, 332 F.3d 502, 504 (8th Cir. 2003) (limiting instruction diminishes danger of any unfair prejudice arising from admission of other acts). Further, we have reviewed the entire record and find that any evidentiary error was harmless because Carlson's substantial rights were unaffected and the evidence had "little or no influence on the [guilty] verdict." United States v. McPike, 512 F.3d 1052, 1055 (8th Cir. 2008).

## VI.

Accordingly, we grant the pending motion to seal Appellee's brief, and we affirm the judgment of the district court.

———————————————